IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CV-854-BO

| | |
|---|---|
| CALEB WARDRETT,<br>          Plaintiff,<br><br>v.<br><br>CITY OF ROCKY MOUNT, NORTH<br>CAROLINA, JOHN DOE I, JOHN DOE<br>II, and JOHN DOE III, in their official and<br>individual capacities, and OFFICERS<br>S.C. CLIFTON and JONATHAN<br>DENOTTER, in their official and<br>individual capacities,<br>          Defendants. | O R D E R |

This cause comes before the Court on defendants'—City of Rocky Mount, North Carolina, Detective Sharieka Clifton, and Detective Jonathan Denotter—motion for summary judgment. [DE 43]. Plaintiff was sent a *Roseboro* letter. [DE 46].[1] Plaintiff did not respond to the motion for summary judgment, and the matter is ripe for ruling. For the reasons discussed below, defendants' motion for summary judgment is GRANTED.

BACKGROUND

This case arose from the shooting of a man named William Richardson that occurred in Rocky Mount, North Carolina, in the early morning hours of October 25, 2013. Detectives Jonathan Denotter and Sharieka Clifton of the Rocky Mount Police Department (RMPD) both worked the case.

That night, following the shooting, Det. Clifton learned that Richardson was being taken to Nash General Hospital in Rocky Mount. She went to the hospital, where she was able to speak to him briefly. He told her he had been driving his girlfriend's car with a man named Dennis

---

[1] At the time the complaint was filed, plaintiff was represented by counsel, but he is now proceeding *pro se*. [DE 36].

("DJ") Bass earlier that night. He said he was in an apartment complex parking lot on Layola Avenue when a gun was put to his head. He was ordered out of the car and told to strip. The suspects took his clothes, money, and cell phone before shooting him three times.

Det. Clifton then spoke to Richardson's mother, Cassandra Fox, who was with her son at the hospital. Fox, who had been in the room while Det. Clifton spoke to Richardson, advised Det. Clifton that a man named Caleb Wardrett shot Richardson. She also told Det. Clifton that another witness, Rodnecia Jones, to be discussed *infra*, told her Wardrett shot Richardson. Finally, she told Det. Clifton that Wardrett and Richardson had been in a physical altercation the week prior.

Richardson was then transferred to Vidant Hospital in Greenville, North Carolina, and Dets. Clifton and Denotter interviewed him more extensively there. Richardson was hesitant to identify his shooter, and both detectives noticed that he seemed scared to tell them who was responsible. Richardson denied that Wardrett shot him but did go so far as to say Wardrett and a man named Demetrius Canady had been at the crime scene. Richardson also confirmed that he and Wardrett had been in a physical altercation about one week prior.

Det. Clifton also spoke to Rodnecia Jones, Richardson's girlfriend, whose car he had been driving that evening. Jones informed Det. Clifton that Wardrett and Richardson had been in a physical altercation the week before and she understood Wardrett was the one who shot Richardson. Later that day, Jones told Det. Clifton that the keys to her car (the car Richardson had been driving immediately prior to the shooting) had just been returned to her by Wardrett's girlfriend, who said she got the keys from Wardrett.

Richardson had been in Jones's car that night with a man named Dennis ("DJ") Bass. After the shooting, Bass called a friend named Tiffany Ricks to come pick him up. Det. Clifton

2

later spoke to Ricks. Ricks told her that that night she had heard gunshots and then Jones's vehicle, which had a distinct sound due to a missing muffler, speeding away. Ricks also told Det. Clifton about a conversation she had had with Bass the day of the shooting. Bass said he was in a car with Richardson immediately before the shooting. Bass said Wardett and Canady walked up to the car, told Richardson to get out, pulled a gun, and forced him to the back of the car, and argued over possession of the gun before Wardrett walked up to the driver's side of the car and told Bass he could leave.

Dets. Clifton and Denotter later spoke to Bass himself in an interview room at the RMPD station. Bass informed them that he had been with Richardson that night, that they were in the car together, and that they drove into the Layola Avenue parking lot where Bass saw individuals he recognized as Wardrett and Canady. Bass stated Canady put a gun in Richardson's face and made him get out of the car. They then argued over the gun, and Wardrett told Canady to make Richardson remove his clothes. Wardrett then got in the car and told Bass "I ought to kill you, but I'm going to give you a pass!" Bass then exited the car and ran away. As he ran, Bass heard gunshots and heard the car Richardson had been driving. Bass ran to his mother's home and then called Ricks to pick him up. Bass also showed the detectives where the crime had occurred on a map; the location he identified coincided with where Det. Denotter had earlier found three bullet casings.

Dets. Clifton and Denotter later interviewed Wardrett at the RMPD station, where he had appeared after initially running from RMPD officers. Wardrett denied being in the area when Richardson was shot, claiming he was at home elsewhere in Rocky Mount that night. Around this time, a man named Steven Lane arrived at the RMPD station and told Dets. Clifton and Denotter that he had arrived home shortly after the shooting and that Wardrett stepped from the

side of his house and said to let him in because there had been a shooting outside. When the detectives informed Wardrett of this, he immediately denied Lane's account and said he did not wish to speak to the detectives any further.

Based on all the information gathered about the shooting, Dets. Clifton and Denotter believed they had probable cause to have an arrest warrant issued for Wardrett for the shooting of Richardson. Magistrate Judge Coates also found probable cause and issued a warrant for arrest for Wardrett.

At the subsequent state court probable cause hearing, several witnesses apparently failed to appear or changed their accounts of what happened, and the charges against Wardrett were dismissed. [*See* DE 4, 44].

## DISCUSSION

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." *Anderson v. LibertyLobby, Inc.*, 477 U.S. 242, 252 (1986). Speculative

4

or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Here, plaintiff's claim against all defendants is pursuant to 42 U.S.C. § 1983. [DE 4]. Plaintiff's complaint sues named defendants in their individual and official capacities and alleges a pattern or practice of behavior making Rocky Mount liable for the officers' actions. *Id.*

I. Official Capacity Claims

Defendants assert the defense of governmental immunity against plaintiff's official capacity claims. As "suits against public officers in their official capacities actually raise claims against the entity for which the officer works," the Court will not address the official capacity claims against the individual defendants as they are duplicative. *Anderson v. Caldwell County*, 524 Fed. Appx. 854, 856 n.1 (4th Cir. 2013) (unpublished) (per curiam); *see also Ky v. Graham*, 473 U.S. 159, 166 (1985) ("Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). The Court will discuss plaintiff's attempted claim against the City of Rocky Mount, *infra*.

II. Individual Capacity Claims

Defendants assert the defense of qualified immunity against plaintiff's individual capacity claims. Deciding whether defendants have the defense of qualified immunity requires "(1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the officer's position would have known that doing what he did would violate the right." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998) (quoting *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992)).

Here, as to the first step, the Court interprets plaintiff's claim to be one for false arrest or malicious prosecution under the Fourth Amendment of the United States Constitution, which guarantees "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[2] U.S. Const. Amend IV. As to the second step, a false arrest or malicious prosecution would certainly be clearly established constitutional violations. Thus, the Court must determine whether officers in this case were "plainly incompetent or knowingly violated the Fourth Amendment in seeking a warrant to arrest" Wardrett. *Porterfield*, 156 F.3d at 568.

A finding of probable cause defeats a false arrest/malicious prosecution claim. *See Gantt* at 146–47. Probable cause is based upon a practical assessment of the totality of the circumstances. *United States v. Garcia*, 848 F.2d 58, 60 (4th Cir. 1988). There is probable cause for an arrest when "'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Probable cause requires "more than 'bare suspicion' but requires less than evidence necessary to convict." *Id.* In instances where arresting officers take "the additional procedural step of seeking an arrest warrant," the defendant is then arrested "not upon what the [officers] believed, but upon the warrant that the magistrate issued." *Porterfield*, 156 F.3d at 570. If there is valid probable cause for an arrest, it follows that there is probable cause for an arrest warrant. *See id.*; *see also Miller v. Prince George's Cty.*, 475 F.3d 621, 627–28 (4th Cir. 2007) (requiring

---

[2] As to whether plaintiff's action is specifically for false arrest or malicious prosecution, as defendants note, this is a distinction without a difference, as both causes of action are evaluated under the Fourth Amendment's prohibition against unreasonable seizures. *See Gantt v. Whitaker*, 57 Fed. Appx. 141, 145–46 (4th Cir. 2003).

6

deliberate or reckless material false statements in a warrant affidavit to succeed on a claim that a seizure was unreasonable because it followed a warrant based on a dishonest affidavit).

Here, there was ample probable cause for the officers to seek an arrest warrant. At the time the officers arrested Wardrett, they had the following support for probable cause:

1) The conversation with Richardson's mother implicating Wardrett;

2) The conversation with Richardson himself advising that Wardrett was "at the crime scene;"

3) The conversations with Jones linking Wardrett to the vehicle Richardson had been driving that evening and implicating Wardrett;

4) The conversation with Ricks implicating Wardrett based on discussions with Bass;

5) The conversation with Bass describing the night's events and implicating Wardrett;

6) Wardrett's inconsistent alibi, as seen in Lane's and his different accounts of Wardrett's whereabouts at the relevant time;

7) The fact that Wardrett and Richardson had been in a physical altercation about a week prior; and

8) The magistrate's finding of probable cause.

The fact that certain witnesses later provided a different version of events at Wardrett's probable cause hearing causing the charges against him to be dismissed is of no moment in the probable cause determination, which is based on what the officers reasonably believed and knew at the time—not later developments. *See Herring v. United States*, 55.U.S. 135, 139 (2009) ("When a probable-cause determination was based on reasonable but mistaken assumptions, the person subjected to a search or seizure has not necessarily been the victim of a constitutional violation. The very phrase 'probable cause' confirms that the Fourth Amendment does not demand all

7

possible precision."); *Pierson v. Ray*, 386 U.S. 547, 555 (1967) ("[A] peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved"). For all these reasons, the Court is abundantly satisfied that there was probable cause to support the arrest warrant.

As "[t]he Supreme Court has held that when a police officer acts pursuant to a warrant, he is entitled to qualified immunity if he could have reasonably believed that there was probable cause to support the application," and the officers here were acting pursuant to a warrant with ample reason to believe there was probable cause to support it, plaintiff's § 1983 claim against defendants in their individual capacities fails. *Porterfield*, 156 F.3d at 570 (citing *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986)).

III. Claim Against the City of Rocky Mount

The Court also construes the complaint as including a *Monell* claim under 42 U.S.C. § 1983. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978). The Supreme Court has determined that § 1983 applies to local governments. *Id.* at 690. However, that application is not without limits. Indeed, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. In other words, there is no *respondeat superior* liability under § 1983 claims. Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.*

Even if a § 1983 plaintiff can establish the requisite policy or custom, the plaintiff must also prove that the custom or policy is the "moving force" behind the alleged violation. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Indeed, "municipal liability will attach only for

those policies or customs having a 'specific deficiency or deficiencies . . . such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.'" *Id.* (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1389–91 (4th Cir. 1987).

Here, plaintiff's complaint states that "[t]he actions of the individual Defendants as herein alleged constitute a pattern and practice making the Defendant City of Rocky Mount liable for the actions of the individual police officers." [DE 4].

As to defendants Denotter and Clifton, as a foundational matter based on the evidence before the Court, the Court is not persuaded that a constitutional violation occurred. As the Court has established *supra*, there was sufficient probable cause to obtain a warrant and arrest defendant. Plaintiff has offered no evidence concerning other alleged wrongful acts committed by these officers or any evidence of a custom or policy that propelled defendants' actions in this case.

As to defendants John Doe I–III, to the extent plaintiff attempts to establish a custom or policy by listing his prior arrests at their hands, this also fails.[3] Other than a recital of his previous arrests, plaintiff offered no evidence whatsoever on this claim. Plaintiff did not submit arrest records, police reports, police department statistics, affidavits, policies, or even anecdotal evidence of a custom or policy to support the claim. The Court cannot conclude from a list of charges, case numbers, and outcomes, that these arrests were unconstitutional, much less that they were animated by a unconstitutional custom or policy.

---

[3] From the docket it appears plaintiff was not given notice of Federal Rule of Civil Procedure 4(m). Regardless, John Doe I–III are dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted for the reasons discussed *supra*. The Court further notes that these defendants are only discussed in regard to the attempted *Monell* claim, in which the individual officers would be inappropriate defendants. For these reasons, there is no need to attempt to re-serve these defendants.

9

As plaintiff has failed to establish a constitutional violation or unconstitutional custom or policy, the claim against the City of Rocky Mount also fails.

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is GRANTED. [DE 43]. Additionally, the claims against defendants John Doe I–III are dismissed for failure to state a claim on which relief can be granted. The clerk is directed to close the file.

SO ORDERED, this _6_ day of April, 2016.

*Terrence W. Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE